Nathaniel Kelly, Esq., SBN 262016
LAW OFFICES OF NATE KELLY
388 Market Street, Suite 1300
San Franscisco, CA 94111
Telephone:  (415) 336-3001
Email:      esquire@natekelly.com

Attorneys for Plaintiffs ADTANGO, INC.
MARK DE CASTRO, PEDRO BRINGAS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADTANGO, INC., a California Corporation, Mark DE CASTRO, an individual, and PEDRO BRINGAS CASADO, an individual<br><br>PLAINTIFFS,<br><br>v.<br><br>LERNA, LLC; LERNA LABS LLC, Alex ROWLAND, an individual; Nelson Becerra, an individual, and DOES 1 through 25, inclusive,<br><br>DEFENDANTS.<br><br>Defendants. | Civil Action No.<br><br>**COMPLAINT FOR:**<br><br>**1)  ACCOUNTING**<br>**2)  VIOLATION OF THE SECURITES ACTS OF 1933 (Section 10(b)) AND 1934 (Rule 10b-5)**<br>**3)  BREACH OF FIDUCIARY DUTY**<br>**4)  VIOLATION OF CALIFORNIA CORPORATIONS CODE SECTION 25401**<br>**5)  MONEY HAD AND RECEIVED**<br>**6)  FRAUD**<br>**7)  UNJUST ENRICHMENT**<br>**8)  CONVERSION**<br>**9)  BREACH OF CONTRACT**<br>**10) UNFAIR COMPETITION**<br>**11) VIOLATION OF 15 U.S.C. § 1125(a)**<br><br>**and**<br><br>**DEMAND FOR JURY TRIAL** |

**Verified Complaint for Declaratory and Injunctive Relief**
**(INJUNCTIVE RELIEF SOUGHT)**

-1-

**NATURE AND SUMMARY OF THE ACTION**

1.   This is an action brought by PLAINTIFFS ADTANGO, INC. ("ADTANGO" or the "Company"), MARK DE CASTRO ("MR. DE CASTRO"), and PEDRO BRINGAS CASADO ("MR. BRINGAS"), (collectively "PLAINTIFFS") seeking monetary damages and injunctive relief against DEFENDANTS LERNA LLC ("LERNA"), LERNA LABS LLC ("LERNA LABS"), Alex ROWLAND ("MR. ROWLAND"), and NELSON BECERRA ("MR. BECERRA") (collectively, "DEFENDANTS") in connection with DEFENDANTS' wrongful attempt to take control of PLAINTIFFS' assets. PLAINTIFFS and DEFENDANTS together are referred to herein as ("THE PARTIES").

2.   DEFENDANTS' wrongful acts include, without limitation, fraud, violations of California and Federal Securities laws, conversion, negligent misrepresentation, breach of written contract, unjust enrichment; and trademark infringement.

3.   Defendants' began their wrongdoing during the summer of 2014, when Mr. ROWLAND, who, after serving as his boss at a company called Alpha Bird, had become something of a mentor for Mr. DE CASTRO, offered to assist Mr. DE CASTRO with his fast-growing new venture, ADTANGO, Inc.

4.   Mr. ROWLAND claimed, his company, LERNA was profitable enough to finance ADTANGO's growth, and through schemes and artifice, has since bilked the company out of more than $200,000, leaving him well off but the Company (ADTANGO) close to bankruptcy.

**JURISDICTION AND VENUE**

5.   PLAINTIFFS bring their Complaint under Federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are diverse in citizenship and the amount in controversy exceeds $75,000.

6.   There is also Federal Question Jurisdiction under the Securities Acts of 1933 and 1934, as well as the LANHAM (TRADEMARK) ACT (15 U.S.C.).

7.   Venue is proper in this Court pursuant to 28 U.S.C. because a substantial part of the events and omissions giving rise to the claims herein occurred, and a substantial part of the property that is he subject of this action is situated, in this District. Among other things,

Defendants undertook their actions, knowing, and with the intention that, they would damage PLAINITFFS in this District.

## THE PARTIES

8.      Plaintiff ADTANGO is a California Corporation existing under the laws of the State of California, United States, having its principal place of business in La Quinta, California.

9.      Plaintiff MR. DE CASTRO is an individual residing in Riverside County, California.

10.     Plaintiff MR. BRINGAS is an individual residing in Montgomery County, Maryland.

11.     Defendant LERNA, LLC is a limited liability company existing under the laws of the State of Nevada, United States, having its principal place of business in San Francisco, CA 94105.

12.     Defendant MR. ROWLAND is an individual residing, at all relevant time in this action, in the state of California.

13.     Defendant Becerra is an individual residing, at all relevant time in this action, in the state of California.

14.     LERNA LABS LLC is believed to be a fictional entity but its true identity is unknown.

## FACTUAL BACKGROUND

15.     In or around 2013, MR. DE CASTRO worked at a company called Alpha Bird.  MR. ROWLAND was MR. DE CASTRO'S boss at Alpha Bird, and a mentor mentee relationship was formed and continued when the worked together after MR. ROWLAND rebranded Alpha Bird as Emerge Digital following the botnet scandal, described in point 37 below.

16.     MR. BRINGAS consulted for Emerge Digital for a couple months in 2013; which is when he met MR. DE CASTRO.

17.     During which period MR. ROWLAND continued to earn and build trust with MR. DE CASTRO by speaking to him about his successes and sharing confidences.

18.     And when MR. DE CASTRO was thinking about going out on his own, he reached out to MR. ROWLAND.

19.     MR. BRINGAS had no prior relationship with MR. ROWLAND.

20.    ADTANGO was founded by MR. DE CASTRO and MR. BRINGAS in February 2014 with the goal of bringing programmatic efficiency, data modeling and analytics to advertisers focused on the Hispanic American digital audience.

21.    MR. DE CASTRO was named Chief Executive Officer, ("CEO") a position that, for all relevant times in this action, he has never relinquished.

22.    When MR. DE CASTRO formed ADTANGO, MR. ROWLAND allowed ADTANGO to use LERNA's office at 607 Market St., San Francisco, as ADTANGO's corporate headquarters, although ADTANGO operated "virtually" with both MR. DE CASTRO based in Southern California and MR. BRINGAS based in Northern California, then later in Montgomery County, Maryland.

23.    ADTANGO began to take off almost immediately, growing its monthly gross receipts from five hundred dollars ($500) to seventy thousand dollars ($70,000) between February and September 2014.

24.    While its high growth rate made ADTANGO's future look promising, online ad sales is a relatively low-margin business with "mismatched" accounts payable and accounts receivable maturity dates – that is, accounts payable were due from vendors before accounts receivable were collected from clients. The result was an anticipated shortfall of capital on hand to reinvest, slowing ADTANGO's growth curve.  Therefore, to continue growing at a high rate, ADTANGO needed to obtain financing, at least in the short term.

25.    In or around August 2014, MR. DE CASTRO began searching for the right financing solution, when the concept of factoring came up.  A factor could provide advance payments on accounts receivable, which would thus provide ADTANGO with the immediate capital it needed to continue growing at its accelerated rate.

26.    As ADTANGO was engaged in these negotiations, MR. DE CASTRO had a discussion with MR. ROWLAND regarding factoring, as well as other financing options. During one of these conversations, MR. ROWLAND advised MR. DE CASTRO that ADTANGO, due to its being open less than a year and utilizing, what he claimed was, an immature bookkeeping

methodology, would likely have trouble finding any reasonable financing options and that LERNA might be best able to assist.

27.    Specifically, MR. ROWLAND stated that LERNA had already established a track record of strong revenues for long enough to have a factoring agreement in place and as a result of their excellent financial position, could solve ADTANGO's financing issues (acting as a de facto factor   for ADTANGO by advancing payments owed until receivables came in to repay them).

28.    MR. ROWLAND additionally stated to MR. DE CASTRO that LERNA had the capacity to benefit ADTANGO by providing LERNA with back-end business operations, including vastly improved bookkeeping.

29.    MR. ROWLAND stated that LERNA was in need of operational, reporting and analytics leadership; particularly for LERNA's AmpDesk platform, its online hub for finance and business operations. MR. ROWLAND was aware that MR. DE CASTRO and MR. BRINGAS had the capability to perform such work in relation to AmpDesk.  MR. ROWLAND, therefore, proposed that the parties enter a stock swap or merger.

30.    MR. DE CASTRO and MR. ROWLAND had previously discussed working together again, and given their relationship and what MR. ROWLAND had told him about LERNA, MR. DE CASTRO was excited about the opportunity.

31.    In or around September 2014, as MR. DE CASTRO began thinking more seriously about developing a business relationship with LERNA, he began to inquire about LERNA's financial condition and outlook.

32.    MR. DE CASTRO requested documented financial information as to LERNA, which would support MR. ROWLAND's claims of LERNA's allegedly strong financial position.

33.    MR. ROWLAND provided scant evidence, but re-iterated that buying into LERNA was a wise and prudent decision because LERNA was on strong financial ground; and MR. ROWLAND did, however, inform MR. DE CASTRO that in July 2014, LERNA had revenues of approximately $10,000 per day.  Those numbers impressed MR. DE CASTRO and MR. BRINGAS.

34.    MR. ROWLAND further represented that LERNA was building out vertical markets in fields such as sports and entertainment, and had already made substantial headway.

35.    After hearing MR. ROWLAND discuss what LERNA's condition and outlook, and its ability to immediately provide both financing/factoring and bookkeeping, MR. DE CASTRO was excited to work with his old boss MR. ROWLAND to grow ADTANGO.

36.    What MR. DE CASTRO did not know at the time, was that MR. ROWLAND did not intend to help but saw MR. DE CASTRO as a potential mark, seeking access to ADTANGO's books so he could help himself to the money the Company was generating.

37.    This, in fact, is not the first time MR. ROWLAND has been implicated in a scheme to defraud, although previously he was assumed an innocent bystander. In 2013, MR. ROWLAND was linked to the so-called botnet scheme, which hijacked 120,000 residential PCs in the US to auto-click on paid advertising, defrauding advertisers of millions of dollars a month. See, http://www.ft.com/cms/s/0/ab60c728-908f-11e2-a456-00144feabdc0.html#axzz3zmvjqeZ1.

38.    Later in September 2014, LERNA, through MR. ROWLAND, made a formal proposal, whereby MR. DE CASTRO and MR. BRINGAS would become co-owners of LERNA. In so doing, MR. ROWLAND stated to MR. DE CASTRO and MR. BRINGAS that the deal would be beneficial because, with LERNA's assistance, they would be able to continue growing ADTANGO faster than would otherwise be able to do without financing, and also own a piece of a growing entity (LERNA).

39.    On or around October 6, 2014, MR. ROWLAND made an offer to exchange shares in LERNA for shares in ADTANGO.

40.    MR. DE CASTRO and MR. BRINGAS, having considered all the advantages of working with LERNA as represented by MR. ROWLAND, decided to "buy in".

41.    Neither MR. ROWLAND nor LERNA prepared offering memoranda regarding a proposed sale of its securities.

42.    Neither MR. ROWLAND nor LERNA provided relevant financial statements, proforma or otherwise, to MR. DE CASTRO or MR. BRINGAS necessary to properly evaluate the benefits of owning shares in LERNA.

43.    Neither MR. DE CASTRO or MR. BRINGAS are accredited or experienced investors, and thus did not fully understand the type of information they needed to fully evaluate the investment.

44.    MR. DE CASTRO and MR. BRINGAS thus remained unaware of the true financial condition of LERNA, relying solely on the claims of MR. ROWLAND that LERNA stood in excellent financial position, capable of providing short-term financing / factoring as to ADTANGO's receivables such that ADTANGO could continue its fast-paced growth.

45.    MR. ROWLAND then drafted and provided MR. DE CASTRO and MR. BRINGAS a term sheet, outlining a proposal whereby LERNA would acquire ADTANGO in exchange for certain consultant agreements that included both compensation and substantial stock option awards to MR. DE CASTRO and MR. BRINGAS, who were offered 600,000 and 300,000 shares, respectively; with half to be earned based on time working with LERNA and half based on profitability of ADTANGO. Specifically, the term sheet stated:

   a.   In the first month where ADTANGO CM exceeds $50,000, one third of options shall vest.

   b.   In the first month where ADTANGO CM exceeds $150,000, an additional one third of options shall vest.

   c.   In the first month where ADTANGO CM exceeds $300,000, the option shall be one hundred percent vested.

46.    The term sheet also stated, "Mark DE CASTRO shall be CEO of ADTANGO.  So long as ADTANGO's gross margin at least equals its operating costs, DE CASTRO shall be solely responsible for running the day-to-day ADTANGO operations, except that any changes in any compensation for Mr. DE CASTRO or Mr. BRINGAS shall require Board of Director approval."

-7-

47.   The offer or sale of stock options is, generally, considered to be the offer or sale of securities as a matter of California and Federal law.

48.   NEITHER MR. DE CASTRO nor MR. BRINGAS were offered management or control rights of LERNA.

49.   MR. DE CASTRO AND MR. BRINGAS believed they were being offered the opportunity to own a substantial piece of an already successful company and the opportunity to fully exploit ADTANGO's potential, which would even further increase the value of the LERNA stock they were being offered.

50.   186.   MR. DE CASTRO and MR. BRINGAS agreed to take below market salaries from ADTANGO and sell some or all of their interest in ADTANGO, a company that at the time could be valued at over one million dollars and $10,000,000 as of July 2015, for an opportunity to obtain more valuable equity in LERNA.

51.   Mr. ROWLAND, despite promising to provide ADTANGO with short term financing in order to help it grown, and provide Mr. DE CASTRO and Mr. BRINGAS with valuable shares in LERNA, really had no intention of actually benefiting Plaintiffs; instead planning on using ADTANGO solely to benefit himself by obtaining discounted services from Plaintiffs and ripping the Company off for what is believed to be more than $400,000.

52.   MR. DE CASTRO, on the one hand, and LERNA, on the other hand, had signed the term sheet by October 9, 2014.

53.   MR. ROWLAND then drafted and offered a long form agreement (the "SPA"). See Exhibit 1.

54.   The document drafted by MR. ROWLAND is so rife with errors, inconsistencies, and altogether missing clauses, as to render its comprehension impossible at points and difficult throughout.

55.   MR. DE CASTRO and MR. BRINGAS, however, not being represented by counsel, were not fully aware of all the issues and inconsistencies with the SPA at the time; nor were they sophisticated enough to request and or review additional documents documents deemed

-8-

necessary as a matter of law to buy and sell securities (including securities in the form of service compensation stock options).

56.   MR. DE CASTRO, MR. BRINGAS, and the two other parties signed the SPA but, although there was a signature space for LERNA, PLAINITFFS never received a countersigned agreement from LERNA.

57.   There were several other problems with the SPA:

        a.   LERNA, in fact, did not have any stock at all, but member interest that had in no way, shape or form been divided into classes or shares of stock.

        b.   Neither LERNA nor MR. ROWLAND created or issued any stock certificates.

        c.   No stock option plan existed or was created at any relevant time in this action.

58.   MR. ROWLAND did not disclose these (a, b, or c) important facts to PLAINTIFFS.

59.   For reasons to be established, neither MR. ROWLAND nor LERNA registered the sale of these securities as required under California law.

60.   Despite its many inconsistencies, some things, however, are clear in the SPA:

61.   The shares in LERNA offered to MR. DE CASTRO and MR. BRINGAS are specifically identified as "Consideration Shares" in Section 5.2 and as part of the "Purchase Price" in Section 2.2 (b).

62.   Neither MR. DE CASTRO nor MR. BRINGAS were to become managers of LERNA.

63.   The SPA, in sections 2.2(b), 2.3 and 2.4, states that LERNA must deliver stock option agreements by November 15, 2014 in order to complete the transaction and to make the SPA binding.

64.   According to the SPA, MR. DE CASTRO and MR. BRINGAS had (and/or have) the right to terminate the agreement if LERNA failed to deliver the stock option agreements or, "in the event any representation or warranty with respect to the Purchaser is determined to be false in any material respect..."

_____

65.    At no point did LERNA create a stock option plan or attempt to deliver stock options agreements to MR. DE CASTRO and MR. BRINGAS.  Similarly, ADTANGO never delivered stock certificates.

66.    Additionally, at this time, it would be impossible for LERNA to offer and MR. DE CASTRO and/or MR. BRINGAS to accept, stock options, as the terms of the stock option plan would have to be negotiated, and the stock options' value – including but not limited to its the relative proportion of the number of options to the whole (e.g. are 300,000 share equal to 20% or 2%) – would have to be negotiated in a situation where there is no longer trust.

67.    For reasons of lack of signature by LERNA, lack of occurrence of closing conditions of the SPA, and a number of missing provisions and key terms that led to a shocking amount of ambiguity in the SPA, it never closed and was never enforceable against the parties.

68.    In fact, MR. ROWLAND, in furtherance of his scheme to defraud, acknowledged to Mr. DE CASTRO that the SPA was not completed or finalized but, convinced MR. DE CASTRO to "keep things loose" and table further discussions and negotiations so that MR. DE CASTRO and MR. BRINGAS could focus on growing ADTANGO.

69.    No shares were formally transferred (no certificates traded or signed) and ADTANGO did not elect any member of LERNA to its Board.

70.    The service-for-service exchange was not materially affected by the SPA's lack of closing; the PARTIES agreed on performance whereby LERNA would handle bookkeeping and provide short-term financing so that that ADTANGO would not fall behind on its accounts payable in exchange for repayment when receivables came in and Mr. BRINGAS would dedicate his time, with the help of MR. DE CASTRO, to updating the AmpDesk platform.

71.    MR. BRINGAS has been working in the Hispanic digital marketing field since 2005 and, having developed a thorough working knowledge of multiple marketing platforms as well as many relationships in the market, made him a very valuable contributor.

72.    He is also a certified translator (English to Spanish) by the American Translators Association.

-10-

73.     The market rate in Silicon Valley for his services would have been around $10,000 a month plus bonuses and stock options.

74.     At all relevant times in this action, there were two ADTANGO bank accounts: Union Bank and Bridge Bank.  MR. DE CASTRO and MR. BRINGAS were the principals on the Union Bank account, and MR. DE CASTRO was the principal on the Bridge Bank account. PLAINTIFFS authorized Ericksson Abad, a bookkeeper at LERNA and Ed Roffman, CFO at LERNA access to act as signers on the accounts to handle billing and invoicing.

75.     Meanwhile, as stated above, pursuant to informal discussions and agreement, MR. BRINGAS continued work on AmpDesk so that it could properly serve as a hub for finance and business operations for LERNA.

76.     Over the next few months MR. DE CASTRO and MR. BRINGAS expended significant time and energy while performing this update in a competent manner at all relevant times in this action; the previous team had not been up to the task but by April, AmpDesk was vastly improved and functional.  MR. DE CASTRO and MR. BRINGAS had expended tremendous effort on AmpDesk, to the point of being forced to divert significant time and energy away from ADTANGO.

77.     MR. BRINGAS spent the primary portion of his time on the AmpDesk platform between around October 2014 and April 2015.

78.     In or around late April 2015, MR. ROWNLAND and MR. DE CASTRO began to discuss parting ways.

79.     PLAINTIFFS had complained that accounts payable were not being met as timely as they expected but, not knowing the extent of the problem, it was Mr. ROWLAND who proposed the parting. PLAINTIFFS now believe, MR. ROWLAND made this proposal believing he had gotten a substantial (unearned) benefit– a discounted update of the AmpDesk platform. There is also reason to believe Mr. ROWLAND had already begun syphoning money from ADTANGO, which will be determined when the books and records kept by third parties are turned over.

80.   MR. DE CASTRO, not knowing of Mr. ROWLAND's scheme to defraud, believed the factoring promised would be more important at that time in 2015 than ever before, and persuaded Mr. ROWLAND to continue their relationship at least through the summer after disclosing that ADTANGO was expecting even greater income over the following four months.

81.   It is now believed when Mr. ROWLAND promised to "continue" the relationship he did not intend to provide any of valuable services negotiated for but, instead, to use his control over ADTANGO's bookkeeping and potential confusion re the status of the SPA, to take all or most of ADTANGO's receivables for himself and not pay on the accounts receivable, leaving both ADTANGO and LERNA with serious liabilities but he and Mr. Becerra with their pockets full.

82.   The Parties agreed to keep their relationship going and then terminate in September 2015, releasing any claims of ownership towards the others' companies.

83.   For the next several months, DE CASTRO's predictions about ADTANGO proved true, as the Company generated hundreds of thousands of dollars of revenue, substantially more than their costs (including salaries), which is also the case for the relevant time period of October 2014 to September 2015.

84.   Around this same time, PLAINTIFFS became very concerned that LERNA was not meeting its promise of factoring ADTANGO's receivables, as LERNA was not paying ADTANGO's bills to vendors nor collecting effectively. ADTANGO had receive notices from major suppliers, the first of which was Facebook, that payments were severely overdue; but during these months, it would be a recurrent theme.

85.   Meanwhile, PLAINTIFFS also became more concerned about the business that LERNA was engaged in. LERNA was strictly buying from aggregators and selling into other aggregators, a no-value add type of activity, which while legal, is frowned upon and attracts the ire of the legitimate digital advertising industry. Further, Lerna had not fully develop any of the vertical networks, as promised in September 2014.

86.   Moreover, as ADTANGO was AmpDesk's largest demand partner for months and ADTANGO were ADTANGO's biggest supplier. MR. DE CASTRO and MR. BRINGAS began to consider that this relationship could hurt PLAINTIFFS' reputation as well.

87.   Additionally, as MR. DE CASTRO and MR. BRINGAS were working many hours per day on AmpDesk, they had an up-close view of LERNA's sales numbers, which were consistently abysmal.  It became clear that the July 2014 numbers provided by MR. ROWLAND to show the purported strength of LERNA were either a complete anomaly or total fabrication.

88.   MR. DE CASTRO and MR. BRINGAS had expended tremendous effort on developing AmpDesk, and were very unhappy with how LERNA's performance of promised factoring.

89.    MR. DE CASTRO was also dismayed in regards to the manner that LERNA had been managing ADTANGO's books. They were aghast at LERNA's lack of communication of payment with ADTANGO vendors and significant delays in collecting from ADTANGO clients.

90.   In or around September 2015, MR. DE CASTRO met with MR. ROWLAND to finalize the termination and unwinding. MR. ROWLAND, however, reneged on his earlier agreement, stating that MR. DE CASTRO could leave but that LERNA would not terminate the business relationship between the parties.

91.   MR. ROWLAND claimed that LERNA was unhappy with the growth of ADTANGO's Hispanic business, despite the fact that ADTANGO has, at all times relevant in this action, sufficient revenues to maintain profitability on an annual basis as can be seen on in the Adtango operational financials kept independently by Mark De Castro. And MR. DE CASTRO strongly suspects that LERNA was taking money from ADTANGO to pay itself, a suspicion which is strongly supported by ADTANGO's financial records as kept by LERNA.

92.   It is now believed Mr. ROWLAND's claims about being "unhappy" with ADTANGO's growth were a ruse to attempt to usurp the CEO role per the void SPA.

93.   What MR. DE CASTRO did not know at the time, but has since discovered, is that during the same period in September MR. ROWLAND was simultaneously entering into an

-13-

unauthorized agreement with a company called Marble Bridge ("MB") to factor ADTANGO's receivables ("MB FACTORING AGREEMENT").

94.    PLAINTIFFS have just recently discovered documentation showing Mr. ROWLAND falsely claiming to be CEO of ADTANGO when entering this factoring agreement, despite the fact there was absolutely no point prior where MR. ROWLAND had ever expressed any statement that he was CEO of ADTANGO or had the right to replace MR. DE CASTRO as CEO of ADTANGO. Such impersonation occurred simultaneously at the time MR. ROWLAND was communicating with MR. DE CASTRO, acknowledging that MR. DE CASTRO was CEO.

95.    MR. ROWLAND was never elected to the ADTANGO board, nor did he take any other measure, that would enable him to legitimately represent himself as CEO of ADTANGO. Instead, he flatly misrepresented his capacity regarding same.

96.    LERNA has, since at least March 2015, been obtaining *direct cash advances* against ADTANGO's accounts receivable LERNA but failing to provide the promised short term financing (e.g. factoring) for ADTANGO, such that ADTANGO would not fall behind on payments to vendors[1]. DEFENDANTS negotiated a factoring agreement with Lender's Financial, whereby LERNA received advances on ADTANGO receivables, which DEFENDANTS did not use to benefit ADTANGO or PLAINTIFFS, instead, simply keeping the monies for themselves.

97.    After investigation, including review of financials supplied by PLAITIFFS, it is now clear to PLAINTIFFS that DEFENDANTS were taking ADTANGO receivables for themselves instead of paying ADTANGO bills, in amounts of over $200,000 to Facebook alone.

---

[1]        The financial records, including profit and loss statements, will show that during the course of LERNA and ADTANGO's relationship, ADTANGO's accounts receivable exceeded its accounts payable and operating costs – they were profitable. The issue was only that payments to vendors were often due months prior the income generated from the vendors was received. Which is where LERNA was supposed to come in and help.

_____
**COMPLAINT FOR ACCOUTING, SECURITIES VIOLATIONS, BREACH OF CONTRACT, ETC.**

98.   PLAINTIFFS are also informed and believed that MR. ROWLAND and MR. BECERRA were using the advances (diverted ADTANGO revenues) to pay themselves enormous and unjustified salaries without consent from PLAINTIFFS. (PLAINTIFFS can see no justification for paying huge salaries to LERNA employees directly from (advances on) ADTANGO receivables while simultaneously not paying ADTANGO vendors and publishers necessary for the functioning of the underlying business.)

99.   MR. DE CASTRO and MR. BRINGAS, conversely, had at all relevant times in this action paid themselves well below market salary for a CEO and CTO of a profitable advertising company, $8,000 and $7,700 per month, respectively, based on agreement that doing so would allow equity in ADTANGO and or LERNA to, in the long run, make up for the shortfall and make their business relationship with LERNA worthwhile.

100.  As money earmarked for ADTANGO vendors never actually made it to the vendors, and ADTANGO grew more and more delinquent, MR. DE CASTRO and MR. BRINGAS's professional reputations were becoming increasingly tarnished.

101.  It became evident that the LERNA relationship was likely going to result in a complete decimation of ADTANGO's business, as its key accounts, including without limitation Facebook and AOL, were being shut off as a result of non- payment and unresponsiveness; and, starting in late November 2015, ADTANGO was very close to being unable to continue business operations.

102.  MR. DE CASTRO requested ADTANGO financial records, including, Cash Flow statements, updated and detailed profit and loss statements, as well as Accounts Receivable and Accounts Payable aging to diagnose the problem.

103.  Certain profit and loss statements received by MR. DE CASTRO reveal a pattern of shoddy record keeping and point to an obvious "skimming" of ADTANGO revenues:  Such statements, received by MR. DE CASTRO at various points, reveal varying profit and loss numbers for the *same* months across different statements, i.e. they differed from each other for

the same time period! All of the statements differed not only from each other, but also from the numbers that MR. DE CASTRO also kept,

104.   After numerous requests, Mr. DE CASTRO received copies and saw that the latest profit and loss statements had been dramatically revised downward and the outstanding overdue liabilities was over $500,000.

105.   MR. DE CASTRO began to grill MR. ROWLAND and the finance team as to what was going on until matters reached a crescendo during the week of the December 7, 2015.

106.   It had become clear to MR. DE CASTRO that there was at a minimum, gross mishandling of ADTANGO's books and finance – in addition to a high probability of fraudulent activity by LERNA.

107.   Between on or around December 9 and on or around December 11, 2015, PLAINTIFFS, the majority shareholders in ADTANGO, met and discussed extensively about how to proceed.

108.   MR. DE CASTRO and MR. BRINGAS sought legal advice on December 11, 2015 for the formal termination of ADTANGO's business arrangement with LERNA. To do so, despite the overwhelming evidence that the SPA was not the operative agreement between the parties, but because of ROWLAND's apparent claims to the contrary and in an abundance of caution, ADTANGO used termination procedures as provided in the SPA.

109.   On or around December 12, 2015, given the legal counsel it had received, ADTANGO voted to terminate its relationship with LERNA and – to remove any doubt – the SPA. ADTANGO issued notice to LERNA accordingly.

110.   ADTANGO provided notice on or around December 12, 2015 through telephone transmission and by courier on or around December 14, 2015.  ADTANGO held an additional shareholder meeting on or around December 14, 2015, which detailed the events and formulating a plan to pay ADTANGO vendors, and get the company back on solid financial footing.

111.   ADTANGO was subsequently informed by LERNA, through legal counsel, that it refused to acknowledge ADTANGO's termination of their business relationship and specifically, the SPA.

-16-

112.  ADTANGO made a demand to LERNA through counsel to make immediate payment to ADTANGO vendors of amounts outstanding and received some assurances that this would be done. Communication, however, lulled during the holidays until after the New Year.

113.  During this time, ADTANGO focused on reaching out to vendors to explain the delay and payment and attempted to save the business, with some success.

114.  Meanwhile, LERNA began to actively fight the termination by attempting to gain control of ADTANGO by any means possible.

115.  Starting in or around December 2015, DEFENDANTS began purporting to represent ADTANGO using newly created email addresses @ADTANGO.co.  Plaintiff is informed and believes that at the time of the drafting of this Complaint, such use continues to this day.

116.  Further, on or around January 8, 2016, DEFENDANTS took matters into their own hands through the illicit self-help measure of hacking into and obtaining access to MR. DE CASTRO's personal GoDaddy account, and transferred ownership of ADTANGO.com and ADTANGOmedia.com into the control of LERNA.  This was done at the direction of DEFENDANTS by a different company, called LERNA Labs LLC, and persisted until ADTANGO was able to successfully petition GoDaddy to have control of the domain returned on January 28, 2016.

117.  This resulted in LERNA taking over control of the ADTANGO.com domain name.  For one week, from in or around January 21, 2016 to January 28, 2016, DEFENDANTS set up the ADTANGO.com website to be diverted to its own AmpDesk website.  This removed any and all doubt as to who was behind the hacking.

118.  Meanwhile, PLAINIFFS are informed and believe that LERNA informed ADTANGO vendors that MR. DE CASTRO had been fired from ADTANGO, and disparaged him to the same vendors.

119.  DEFENDANTS also, in mid December, blocked PLAINTIFFS from an account called "The Trade Desk", which caused major issues with campaigns that were being delivered, and thus caused a further disruption in ADTANGO's business.

120.   At all times relevant in this action, it was clear that the SPA had never closed, and was not enforceable and that ADTANGO and LERNA remained independent companies.

121.  MR. DE CASTRO retained operational control as CEO at all relevant times in this action.

122.  MR. DE CASTRO, and not anyone at LERNA, decided if and when to change compensation to ADTANGO employees, including without limitation Charles Pitzer and MR. BRINGAS. MR. DE CASTRO informed MR. ROWLAND of his decisions in this regard.

123.  At all times relevant in this action, LERNA charged, and ADTANGO paid for, administrative services and office space.

124.  At this time, DEFENDANTS, have all but destroyed ADTANGO, causing numerous business partners to cancel contracts due to non-payment, while enriching themselves personally, but, for reasons that can only be understood as the continuance of this scheme to defraud, have refused to allow Mr. DE CASTRO and Mr. BRINGAS to take back the business.

125.  Furthermore, DEFENDANTS, in continuing attempt to avoid providing any value to Plaintiffs, have opened a new company competing with ADTANGO, transferring resources to this new entity.

126.  Mr. Becerra is apparently CEO of the new entity.

## FIRST CLAIM FOR RELIEF
### For an Accounting
**(Against All Defendants)**

127. Plaintiffs reallege and incorporate by reference the information and allegations set forth above in paragraphs 1- 126 .

128. As a result of the aforementioned agreement by DEFENDANTS to factor ADTANGO's receivables, defendant LERNA has since received money from ADTANGO customers, a portion of which is due to ADTANGO from defendant, as previously alleged.

129. The amount of money due from defendant LERNA to plaintiff ADTANGO is unknown to plaintiff ADTANGO and cannot be ascertained without an accounting of the accounts receivable received - receipts and disbursements of the aforementioned transactions. Plaintiff

ADTANGO is informed and believes and thereon alleges that the amount due to plaintiff ADTANGO exceeds $200,000.

130. Plaintiff ADTANGO has demanded an accounting of the aforementioned transactions from defendant LERNA and payment of the amount found due but defendant has failed and refused, and continues to fail and refuse, to render such an accounting and to pay such sum.

131. WHEREFORE, Plaintiff ADTANGO seeks judgment against defendants for a full accounting, to be provided within 30 days of the entry of judgment, and such other relief as the Court deems fair and equitable.

**SECOND CLAIM FOR RELIEF**
**Violation of the Securities Act of 1933 and the Securities Exchange Act of 1934**
**(As to all Defendants)**

132. PLAINTIFFS, hereby incorporate paragraphs 1- 131 as set forth herein.

133. Securities sold in the United States that are not registered with the Securities and Exchange Commission "SEC") under Regulation D must conform to the provisions of SEC Regulation D ("Reg. "D").

134. Reg. D Rule 502 states that unregistered securities must be preceded by disclosures that approximate those which would be disclosed in a formal registration.

135. Prior to entering into the SPA (which constitutes a sale of securities as a matter of law), MR. ROWLAND disseminated or approved the false statements specified above, including but not limited to: i) that LERNA had stock with a defined value; ii) that LERNA had a stock option plan; iii) that CEO Alex ROWLAND had a plan and the intention to benefit shareholders of LERNA by growing ADTANGO; and iv) that LERNA had the ability and willingness to factor ADTANGO receivables.

136. Mr. ROWLAND made these statements, which he knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

137. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

-19-

a.   Employed devices, schemes and artifices to defraud;

b.   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which there were made, not misleading; or

c.   Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of LERNA securities.

138. The false, deceptive, and misleading statements and omissions were made with knowledge that Plaintiffs would never receive any profits from the Company.

139. The aforementioned acts were undertaken in violation of Section 12(a) of the Securities Act of 1933, section 10b of the Securities Exchange Act of 1934 and Rule 10b-5 adopted pursuant thereto.

140. Plaintiffs have suffered damages in that, in reliance on the statements and omissions by DEFENDANTS, they paid an artificially inflated price for LERNA securities. PLAINTIFFS would not have purchased LERNA securities at the price they paid, or at all, if they had been aware that the sale price had been artificially and falsely inflated by DEFENDANTS' misleading statements.

**THIRD CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**(As to all Defendants)**

141. Plaintiffs, hereby incorporate paragraphs 1 through 140 as though set forth herein.

142. The agreements entered into by the Parties created a fiduciary that required, without limitation, the duties of care, loyalty, and full disclosure of all material facts that would affect PLAINTIFFS' decision to enter into and or continue a contractual relationship with LERNA and MR. ROWLAND.

143. At all times relevant herein, LERNA and MR. ROWLAND breached their fiduciary duty to Plaintiffs by siphoning money from ADTANGO to their personal benefit, destroying ADTANGO business relationships by failing to pay accounts owned, and by failing to distribute profits as earned.

-20-

144. As a result of the aforementioned breaches of fiduciary duty, PLAINTIFFS have suffered and continue to suffer damages in an amount to be established at trial.

**FOURTH CLAIM FOR RELIEF**
**Misrepresentations or Omissions of Material Facts**
**in Violation of California Corporations Code Section 25401**
**(As to Defendants LERNA and ROWLAND)**

145. PLAINTIFFS reallege and incorporate by reference paragraphs 1 through  144 of this Complaint as though fully set forth herein.

146. California Corporations Code section 25401 provides as follows:
> It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

147. Commencing at least as early as October 2014, LERNA and ROWLAND, offered and sold, securities in issuer transactions in the state of California.

148. The investments offered and sold by LERNA and ROWLAND, are "securities" within the meaning of California Corporations Code section 25019. The securities included, but are not limited to, limited liability company interests in LERNA LLC.

149. The sale referred to herein, were "issuer transactions" within the meaning of sections 25010 and 25011 of the California Corporations Code.

150. The DEFENDANTS "offered and sold" the securities referred to herein in the state of California within the meaning of California Corporations Code sections 25008 and 25017.

151. In offering, selling, and purchasing the securities referred to herein, DEFENDANTS made, untrue statements and or misrepresentations of material facts to DE CASTRO and BRINGAS. The misrepresentations of material facts included, without necessarily being limited to, the following:

    a. <u>Factoring</u>: Defendants stated that it had factoring in place and could provide ADTANGO with factoring, paying off ADTANGO's accounts payable before they came do and before receivables came in;

b. <u>LERNA's Financial Condition</u>: Defendants stated that not only was LERNA in good financial condition and capable of helping ADTANGO with short-term financing necessary for its growth, but that LERNA was making substantial profits, with a value of more than ten times ADTANGO (based on stock sale);

c. <u>Shares and Stock Option Plan</u>: Defendants stated that LERNA, despite being an LLC, was able to grant stock awards and stock options (when it could not).

152. In offering, selling, and purchasing the securities referred herein, DEFENDANTS also omitted to state, material facts to DE CASTRO and BRINGAS. The omissions included, but without necessarily being limited to, the following:

153. LERNA and MR. ROWLAND omitted the material fact that LERNA had not divided its LLC membership interests into stock.

154. LERNA and MR. ROWLAND omitted the material fact that 300,000 shares of LERNA had no defined meaning or definitive value.

155. LERNA and MR. ROWLAND omitted the material fact that it had not created a Stock Option Plan and was thus, at that time, unable to actually provide the promised stock options.

156. They also omitted that Mr. ROWLAND, CEO of LERNA, had no intention or plan to increase the value of the LERNA stock, merely intending to line his pockets with ADTANGO revenue.

157. The misstatements and omissions referred to herein were of "material facts" within the meaning of California Corporations Code section 25401.

158. Mr. ROWLAND made untrue statements and or omitted to disclose statements of material facts in connection with the offer and sale of securities in violation of California Corporations Code 25401.

159. PLAINTIFFS were significantly damages in that the value of their ADTANGO shares have been substantially undermined by MR. ROWLAND's actions and misinformation, with the

-22-

Company now being on the edge of bankruptcy, although the full damages are to be proven at trial.

### FIFTH CLAIM FOR RELIEF
**For Money Had and Received**
**(As to All Defendants)**

160. Plaintiffs, hereby incorporate paragraphs 1 through 159 as though set forth herein.

161. Within the past two years, DEFENDANTS, and each of them, became indebted to PLAINTIFFS in an amount greater than $200,000, for money had and received for the use and benefit of PLAINTIFFS.

162. No part of such sum has been paid, although demand has been made and there is now due, owing, and unpaid, the sum of greater than $200,000 with interest at the rate of 10% per annum from October 15, 2014 and thereafter.

WHEREFORE, Plaintiffs asks that this Court issue a judgment for the damages suffered in the amount of $5,000,000, inclusive of statutory interest, as well as legal fees and costs.

### SIXTH CLAIM FOR RELIEF
**For Fraud**
**(As to Defendant Alex ROWLAND)**

163. PLAINTIFFS refer to and incorporate herein by this reference, all of the allegations contained in paragraphs 1- 162 of this Complaint.

164. The facts show that MR. ROWLAND has been engaged in a ongoing scheme to defraud Plaintiffs since at least October 2014 to the present.

165. PLAINTIFFS placed great trust in MR. ROWLAND at all times relevant in this matter, including but not limited to, the conversations that took place regarding LERNA's ability to provide factoring to ADTANGO.

166. On multiple occasions, including on October 9, 2014 and October 15, 2014, by telephone and email, MR. ROWLAND represented to MR. DE CASTRO that LERNA had the ability and willingness to assist ADTANGO with its short-term financing so that ADTANGO could keep current with its accounts payable without slowing its outstanding growth rate, and that if

-23-

_____
**COMPLAINT FOR ACCOUTING, SECURITIES VIOLATIONS, BREACH OF CONTRACT, ETC.**

ADTANGO signed the SPA, LERNA would factor ADTANGO receivables to allow for its continued growth.

167. MR. ROWLAND further made statements on these days, including those in the term sheet, that the value of LERNA stock options provided to Plaintiffs would increase through the negotiated relationship; that LERNA would support the growth and success of ADTANGO.

168. At the time of these promises, however, Mr. ROWLAND knew that no stock or stock options in LERNA existed, and even if they did, they had no defined value; and further, that he had no intention of growing ADTANGO.

169. Mr. ROWLAND made these false statements intending that they be relied upon, first for the purpose of obtaining essentially free CTO help from Mr. BRINGAS and MR. DE CASTRO updating LERNA's AmpDesk platform, and also for the purpose of personally enriching himself.

170. MR. DE CASTRO, while not in direct contact with the Ampdesk team until January 2015 he was overviewing and discussing Operations with MR. BRINGAS on a regular basis. And, starting January 2015, he commanded Operations.

171. The representation by MR. ROWLAND that LERNA was prepared to address ADTANGO's short-term financing needs at the time the time the SPA was signed on October 15, 2014 was patently false.

172. In fact, almost immediately thereafter, LERNA soon fell dramatically behind on all ADTANGO's accounts payable, and actually diverting accounts receivable into its personal coffers, including and especially through the factoring agreement of September 2015.

173. This is despite the fact that operational financials kept independently by CEO Mark De Castro show ADTANGO was solidly on track for a profitable for 2016 with only a few months of small cash-flow shortfalls (which should have been addressed with the promised short-term financing).

174. Although it appears clear that Mr. ROWLAND actually had no intention of providing the valuable services promised, MR. ROWLAND provided a misleadingly glowing picture to

-24-

PLAINTIFFS of LERNA's financial state for the purpose of gaining services and access to ADTANGO bank accounts.

175. MR. ROWLAND, as CEO of LERNA, knew that LERNA was not as strong financially as he had represented, and therefore not able to enough to provide short-term financing (factoring) to ADTANGO, but chose to exaggerate LERNA's ability in order to induce PLAINTIFFS to support and turn control over its funds over to LERNA.

176. After gaining control of such funds, LERNA was free to, and in fact did, divert accounts receivable into its personal coffers, including and especially through the factoring agreements of March 2015 and September 2015.

177. MR. ROWLAND knew that PLAINTIFFS were concerned about accounts payable becoming due before accounts receivable were collected, and that PLAINTIFFS sought short-term financing for ADTANGO; and was aware that this was the very basis of the PARTIES' initial discussions for collaboration and subsequent negotiations leading to the PLAINTIFFS signing the SPA.

178. MR. ROWLAND continued this fraud when in November 2014, MR. DE CASTRO followed up with him regarding when PLAINTIFFS could expect to receive their shares in LERNA and Mr. ROWLAND stated that it was better to keep the arrangement "loose" and wait on closing so the Parties could be assured the deal was good for both.

179. Despite acknowledging to Mr. DE CASTRO that the SPA was not completed or finalized but, in furtherance of his scheme to defraud, Mr. ROWLAND convinced DE CASTRO to table further discussions and negotiations so that MR. DE CASTRO and MR. BRINGAS could focus on growing ADTANGO.

180. Mr. ROWLAND continued to perpetrate this scheme when in or around March 2015 he entered into a factoring agreement with Lender's Financial, whereby LERNA would receive advance payments on all ADTANGO revenue, while at the same time refraining from paying ADTANGO partners, such as Facebook Live Rail, which were owed more than $10,000 for every month of service.

181. Mr. ROWLAND continued to lie and perpetrate the scheme when in on or around April 2015 he agreed with Mr. Castro to terminate the arrangements with Plaintiffs, releasing all claims against ADTANGO by end of September 2015.

182. Mr. ROWLAND made these promises without any intention to provide the financing central to Plaintiffs concerns but merely so he could continue to take revenue from ADTANGO and place it in his own pockets instead of paying ADTANGO debts as promised, including but not limited to entering into that certain MB Factoring agreement, whereby he claimed to be CEO of ADTANGO.

183. Mr. ROWLAND also apparently had no intention to honor his agreement to release ADTANGO back to Plaintiffs, as stated above. He has also continued to pocket revenues from ADTANGO while not paying off debts. He has since refused to honor DE CASTRO's termination of the SPA and other business with LERNA and himself.

184. Mr. ROWLAND did all of this despite knowing he had no legitimate claim to ownership of ADTANGO or the position of CEO. Even the invalid SPA states that Mr. De CASTRO may not be removed as CEO unless the company's costs exceed revenues, which was not the case, as ADTANGO has, at all times relevant in this action, sufficient revenues to maintain profitability on an annual basis as can be seen on in the operational financials kept independently by Mark De Castro.

185. Mr. ROWLAND never attempted any formal procedure whereby he would properly obtain control of ADTANGO – either through the transfer of shares (which has not occurred) or his appointment as CEO.

186. Documentation has recently been discovered showing that following Mr. DE CASTRO's noticed termination of the SPA in December 2015, ADTANGO issued a notice terminating Mr. DE CASTRO and Mr. BRINGAS. Also following the DE CASTRO notice, Mr. ROWLAND caused to be created an official election of himself to the sole director of Board of ADTANGO and appointment of Becerra as CEO.

-26-

187. This was done both after the signing of the MB factoring agreement by ROWLAND as CEO, despite the fact that shares of ADTANGO had not been formally transferred, *and* in contravention of the BYLAWS of ADTANGO, which require certain procedures for Board changes, and at least three members.

188. PLAINTIFFS were harmed by the LERNA's lack of financing ability in the months subsequent to signing of the SPA and up to the date of the drafting of this Complaint.

189. To the shock of PLAINTIFFS, LERNA provided no financing whatsoever, and allowed accounts payable to reach unacceptably high levels.

190. In practical terms, this has meant that LERNA has not managed ADTANGO's accounts payable or receivable, and thus has not paid ADTANGO vendors ADTANGO.

191. This in turn has caused significant harm to the reputation to ADTANGO and to individual PLAINTIFFS, the individuals who founded ADTANGO, who currently operate ADTANGO, and who must ultimately answer to their peers and business contacts in the digital advertising industry.

192. Also, the ADTANGO's accounts receivable, totaling at least $200,000 but likely upwards of $400,000, are currently in the possession and control of LERNA.

193. These monies were received by numerous contracts entered into by ADTANGO and paid as scheduled, in amounts to be shown at trial.

194. But for the MR. ROWLAND's many misrepresentations, ADTANGO would have never allowed LERNA to gain control of these funds.

195. PLAINTIFFS' reliance on MR. ROWLAND's representation regarding LERNA's financing capabilities was a substantial factor in causing PLAINTIFFS' harm because without this representation, Plaintiff would have never signed the SPA.

196. The SPA gave LERNA control over ADTANGO's accounts payable and receivable.

197. Following LERNA's assumption of such control, and due to such control, ADTANGO, which had previously been able to collect from clients and which had paid vendors on time, fell

-27-

_____

into a state of dysfunction in regards to its accounts payable and receivable, as documented above.

198. Even when LERNA received the funds from ADTANGO advertising sales, it has not paid ADTANGO vendors, keeping upwards of $200,000 owed to Facebook and other vendors for itself.

199. While MR. ROWLAND has enriched himself, PLAINTIFFS have been substantially harmed, loosing hundreds of thousands of dollars, damages to their business and reputations, in an amount to be proved at trial.

**SEVENTH CLAIM FOR RELIEF**
**For Unjust Enrichment**
**(Against Defendants LERNA and Alex ROWLAND)**

200. PLAINTIFFS refer to and incorporate herein by this reference, all of the allegations contained in paragraphs 1- _199_ of this Complaint.

201. By reason of DEFENDANTS' wrongful conduct alleged herein, including DEFENDANTS have been unjustly enriched by misappropriating to themselves funds that rightfully belonged to ADTANGO, and have profited thereby.

202. In addition, PLAINTIFFS provided considerable value to DEFENDANTS, at the request of DEFENDANTS by updating LERNA's AmpDesk platform.  Such work entailed a precise market value to be proven at trial but in any case for no less than $76,000.

203. Meanwhile, despite promises to add value to PLAINTIFFS, by means, including without limitation factoring and bookkeeping, DEFENDANTS, at all relevant times in this action, provided no services of any value to PLAINTIFFS that have not already been compensated by PLAINTIFFS.

204. As a direct and proximate result of their wrongful conduct, the DEFENDANTS, as alleged hereinabove and as may be shown at trial in this action, have enriched themselves in an amount not presently ascertained with certainty but which is in an amount not less than $200,000 but likely more than $400,000 above and beyond any value provided to PLAINTIFFS.

-28-

205. As such, these wrongful profits by DEFENDANTS should be discharged to PLAINTIFFS as a matter of equity.

### EIGHTH CLAIM FOR RELIEF
**For Conversion**
**(Against all DEFENDANTS)**

206. PLAINTIFFS refer to and incorporate herein by this reference, all of the allegations contained in paragraphs 1-205 of this Complaint.

207. DEFENDANTS, and each of them, have wrongfully converted, aided and abetted, and caused to be converted, to their own use, property belonging to PLAINTIFFS.

208. At all relevant times in this action, and notwithstanding any business relationship with DEFENDANTS, MR. DE CASTRO owned and had an exclusive right to possess his personal GoDaddy Account ("GoDaddy Account").

209. This exclusive right extends to all property – including without limitation the domain names ADTANGO.com and ADTANGOmedia.com, and as a result all email addresses utilizing @ADTANGO.com and @ADTANGOMEDIA.com – contained within the GoDaddy Account.

210. After DEFENDANTS hacked into and assumed control of the GoDaddy Account, DEFENDANTS changed the password so that MR. DE CASTRO was no longer able to log in.

211. DEFENDANTS have used MR. DE CASTRO's personal email to impersonate MR. DE CASTRO, including but not limited to for communications with ADTANGO's vendors and clients.

212. At all times since DEFENDANTS have assumed control of the GoDaddy Account, MR. DE CASTRO in informed and believes that DEFENDANTS have enjoyed exclusive control of the GoDaddy Account, and all the property contained within it.

213. DEFENDANTS' hacking was an intentional act, which substantially interfered with MR. DE CASTRO's personal account in that DEFENDANTS took possession of the property and denied MR. DE CASTRO access to it.

214. MR. DE CASTRO did not consent to DEFENDANTS' hacking of or access to the GoDaddy Account.

_____
**COMPLAINT FOR ACCOUTING, SECURITIES VIOLATIONS, BREACH OF CONTRACT, ETC.**

215. MR. DE CASTRO has been harmed because unable to communicate with his business contacts, which are vital to his livelihood as CEO of ADTANGO.

216. Further, damages to his reputation have occurred, and continue to occur, because when DEFENDANTS assumed his identity, informed his business contacts that he has been fired from ADTANGO (an act that DEFENDANTS had no authority to do), and are free to act in ways that are generally averse to his interests.

217. DEFENDANTS' conduct was a substantial factor in causing the harm suffered by PLAINTIFFS because without it caused MR. DE CASTRO to lose access to his personal and valuable property.  Without such loss of access, none of the damages would have occurred.

### NINTH CLAIM FOR RELIEF
**For Rescission of Written Contract**
**(Against all DEFENDANTS)**

218. PLAINTIFFS refer to and incorporate herein by this reference, all of the allegations contained in paragraphs 1- 217 of this Complaint.

219. Individual PLAINTIFFS MR. DE CASTRO and MR. BRINGAS entered into a SPA with Defendant LERNA.  For the purposes of this cause of action, PLAINTIFFS allege that was an enforceable contract in regards to at least the relevant Termination provision.

220. Plaintiffs allege that while the SPA may have been signed, it was not completed, as relevant performances were owed on each side, allowing for Plaintiffs' termination of the SPA per its own terms.

221. Under the SPA, LERNA was to provide PLAINTIFFS with certain compensation. Specifically, Section 2.4b(ii) ) of the SPA requires LERNA to deliver shares to the PLAINTIFFS in the form of stock options within ten days following the closing.

222. MR. DE CASTRO was to receive 300,000 shares' worth of stock options, and MR. BRINGAS was to receive 200,000 shares' worth of stock options.  (This information is not in Exhibit A, which is where it should have been! The stock options were part of the consulting agreements referenced in the SPA.

-30-

223. Given that LERNA's delivery of stock option agreements to BRINGAS and Castro was a closing condition of the SPA, by failing to deliver the stock options, LERNA is prevented from enforcing the contract.

224. In fact, as stated above, LERNA, as an LLC, has not even created shares that could become stock options in LERNA for PLAINTIFFS; and thus one half of the consideration owed to Plaintiffs under the SPA cannot be delivered.

225. LERNA's failure to deliver stock options to PLAINTIFFS represents a material breach; stock options, and the attendant opportunity to obtain ownership in LERNA were an important component of the compensation package for MR. DE CASTRO and MR. BRINGAS.

226. As a direct and proximate result of LERNA's breach of the SPA, PLAINTIFFS have been harmed as to value of ownership in LERNA that the stock options would have provided, for an amount to be proven at trial.

227. Per Section 6.3g of the SPA, PLAINTIFFS MR. DE CASTRO and MR. BRINGAS had the right to terminate the SPA for LERNA's failure to provide valuable consideration in the form of stock option agreement.

228. On December 11, 2015, through their counsel Nate Kelly, PLAINTIFFS MR. DE CASTRO and MR. BRINGAS terminated the SPA in a manner fully compliant with the with the relevant provisions of the SPA, including without limitation 6.3(g) and 8.4 of the SPA.

229. Despite this valid termination, LERNA has further breached the contract by continuing to exercise control over ADTANGO and ADTANGO's assets.  In fact, as above, LERNA has taken affirmative, illicit "self-help" steps to increase such control, including without limitation resorting to hacking the personal account of MR. DE CASTRO.

230. By failing to honor PLAINTIFFS' valid termination, LERNA has inflicted and continues to inflict damages on PLAINTIFFS MR. DE CASTRO and MR. BRINGAS, for an amount to be proven at trial.

231. **Furthermore,** the SPA is VOID and subject to rescission as a matter of law for failure of consideration.

232. This is because, at no point since the signing of the SPA, even if otherwise valid, would LERNA be able to provide the Stock Options promised; there was no Stock Option Plan, no set value of the Stock, and no actual stock or total stock allocation at all!

233. Plaintiffs should not and cannot be forced to exchange their ADTANGO shares for nothing – or the promise of shares that do not exist.

234. Further, as discussed above and below, although the contract would also be subject to rescission for violations of the Securities laws, fraud, the fact is the SPA is subject to termination by its own terms, which LERNA should be made to abide by.

## TENTH CLAIM FOR RELIEF
### False Designation of Origin and False Advertising - 15 U.S.C. § 1125(a)
### (Against all Defendants)

235. Plaintiffs incorporate herein by reference the averments of the proceeding paragraphs as though fully set forth herein.

236. The ADTANGO marks are nonfunctional and their inherently distinctive quality has achieved a high degree of consumer recognition and serves to identify ADTANGO as the source of of high-quality services.

237. Defendants' promotion, advertising, sale, and/or offering for sale of counterfeit ADTANGO services, using the ADTANGO Marks, is intended, and is likely to confuse, mislead, or deceive consumers, the public, and the trade as to the origin, source, sponsorship, or affiliation of said products, and is intended, and is likely to cause such parties to believe in error that Defendants' services have been authorized, sponsored, approved, endorsed or licensed by ADTANGO, or that Defendants are in someway affiliated with ADTANGO.

238. Defendants' use of the ADTANGO Marks is without Plaintiffs' permission or authority and is in total disregard of Plaintiff ADTANGO's rights to control its trademarks.

239. Defendants' acts have damaged and will continue to damage Plaintiffs, and Plaintiffs have no adequate remedy at law.

-32-

240. In light of the foregoing, Plaintiffs are entitled to injunctive relief prohibiting Defendants from using the ADTANGO Marks, or any marks confusingly similar thereto, and to recover all damages, including attorneys' fees, that Plaintiffs have sustained and will sustain, and all gains, profits and advantages obtained by Defendants as a result of their infringing acts alleged above in an amount no yet known, as well as the costs of this action.

### ELLEVENTH CLAIM FOR RELIEF
### State Unfair Competition under Cal. Bus. & Prof. Code §17200
### (Against all Defendants)

241. Plaintiff restates and reavers the allegations of Paragraphs 1 through  240 , inclusive, and the acts of Defendant asserted therein as if set forth in full as part of this Cause of Action.

242. The Defendant's above-averred actions will constitute trademark infringement and passing off in violation of the common law of California.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A. Awarding Plaintiffs' damages, including interest;

B. Awarding Plaintiffs reasonable costs and attorneys' fees;

C. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated:    February 20, 2016              **LAW OFFICES OF NATHANIEL KELLY**

By: *Nate Kelly*
                                         Nathaniel G. Kelly


                                         Law Offices of Nate Kelly
                                         388 Market Street, Suite 1300
                                         San Francisco, CA 94111
                                         (415) 336-3001
                                         Esquire@natekelly.com

                                         Attorneys for Plaintiffs

COMPLAINT FOR ACCOUTING, SECURITIES VIOLATIONS, BREACH OF CONTRACT, ETC.

1

**VERIFICATION**

2

     I SWEAR (OR AFFIRM) UNDER THE PENALITIES FOR PURJURY UNDER THE
LAWS OF THE UNITED STATES THAT THE FOREGOING STATEMENTS

3

CONCERNING ALEXANDER ROWLAND, ADTANGO, INC., AND LERNA LLC ARE
TRUE AND CORRECT TO THE BEST OF KNOWLEDGE AND UNDERSTANDING.

4

Dated: this 20th[th] day of February, 2016.

5

6

7

Pedro Bringas                                       Mark De Castro

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR ACCOUTING, SECURITIES VIOLATIONS, BREACH OF CONTRACT, ETC.